Nancy C. LINDSAY and Bruce H. Lindsay, Plaintiffs-Appellees,

v.

ORTHO PHARMACEUTICAL CORPORATION, Defendant-Appellant.

No. 848, Docket 79-7706.

United States Court of Appeals, Second Circuit.

Argued April 2, 1980.

Decided Dec. 8, 1980.

David F. Dobbins, New York City (Patterson, Belknap, Webb & Tyler, George S. Frazza, Karl E. Seib, Jr., Theodore B. Van Itallie, Jr., Fred J. Baumann and Robert W. Sparks, New York City, on brief), for defendant-appellant.

Roger P. McTiernan, Bridgett A. Lundy, New York City (Barry, McTiernan & Moore, New York City, on brief), for plaintiffs-appellees.

---

\* Hon. Gerard L. Goettel, District Judge of the Southern District of New York, sitting by designation.

Before VAN GRAAFEILAND and NEWMAN, Circuit Judges, and GOETTEL, District Judge.\*

VAN GRAAFEILAND, Circuit Judge:

Ortho Pharmaceutical Corporation (Ortho) appeals from a judgment entered against it in the United States District Court for the Eastern District of New York for injuries allegedly resulting to Nancy C. Lindsay (plaintiff) from the use of oral contraceptives manufactured by Ortho. The jury awarded $750,000 to Mrs. Lindsay and $75,000 to her husband on his derivative claim. Because of error in the proceedings below, we reverse and remand for a new trial.

Ortho is a New Jersey corporation which manufactures an oral contraceptive called Ortho-Novum. This drug is used principally for birth control purposes and is obtainable only by prescription. Mrs. Lindsay began to use Ortho-Novum in December 1965, shortly after she gave birth to her second child. While still in the hospital, plaintiff inquired of her obstetrician and gynecologist, Dr. Bruce Harris, about the use of oral contraceptives. After some discussion of potential side effects, Dr. Harris prescribed Ortho-Novum.

At plaintiff's six-week post-delivery checkup, she reported to Dr. Harris that she was experiencing a tingling feeling and some numbness on the right side of her body, and Dr. Harris sent her to a neurologist, Dr. Edward Vastola. On February 19, 1966, Dr. Vastola reported to Dr. Harris that the entire neurological examination was normal except for a questionable impairment of vibratory sense in both lower extremities. He stated that these symptoms indicated a possibility of multiple sclerosis but that the relevant evidence was insufficient to merit serious discussion of this possibility with the plaintiff or to warrant more extensive neurological diagnostic procedures at that time. Neither Dr. Har-

ris nor Dr. Vastola recommended discontinuance of Ortho-Novum.

In March 1967, plaintiff returned to Dr. Harris for her annual checkup. Although the numbness and tingling sensations were not then as severe as before, she had developed some brown facial blotches. Because of the blotches, Dr. Harris advised plaintiff to stop using Ortho-Novum and recommended instead the use of a diaphragm. It is unclear from the record whether plaintiff followed her doctor's advice. It does appear, however, that between March and September 1967 there was at least a one-month period during which she took no pills.

In May 1967, plaintiff decided to get a second opinion concerning her neurological problems. She went to her family internist, Dr. Clifford M. Weingarten, who referred her to Dr. Edward P. Ryan, a neurological surgeon. Dr. Ryan reported to Dr. Weingarten that plaintiff's neurological examination was completely normal. He dismissed the possibility of multiple sclerosis and saw no need for a more extensive neurological work-up. A copy of this report was sent to Dr. Harris.

In September 1967, Dr. Harris sent plaintiff a new prescription for Ortho-Novum. Although Dr. Harris testified that this prescription was for only a six-month supply of pills, plaintiff continued to have it refilled at her pharmacy until February 1970. At that time the pharmacy informed her she would need a new prescription if she wanted more pills. Instead of returning to Dr. Harris whom she had not seen since March 1967, plaintiff went, on the recommendation of a neighbor, to a Planned Parenthood clinic. She was examined there by Dr. Robert Van Son, who gave her a prescription for a six-month supply of Ortho-Novum. When plaintiff returned to Planned Parenthood for a checkup on October 9, 1970, her blood pressure was found to be abnormally high. She was told to stop using oral contraceptives for one month and was referred back to Dr. Weingarten for treatment of the blood pressure problem. She did not use Ortho-Novum thereafter.

Dr. Weingarten treated plaintiff until early January 1971, when he again referred her to Dr. Ryan because of a recurrence of neurological symptoms. On January 16, 1971, plaintiff was hospitalized by Dr. Ryan after apparently suffering a stroke. Dr. Arthur Rosen, then Assistant Professor of Neurology at the State University of New York, Stonybrook, examined her at Dr. Ryan's request and concluded that she had suffered an ischemic cerebral vascular accident.

This action was commenced by Mrs. Lindsay and her husband on October 3, 1972. Although the complaint named both Ortho and Dr. Harris as defendants, plaintiffs agreed just prior to trial to discontinue as against Dr. Harris. The case against Ortho went to the jury under the doctrine of strict products liability. Following the verdict, Ortho's motion for judgment n. o. v., or alternatively for a new trial, was denied by the district judge in a lengthy opinion. *See Lindsay v. Ortho Pharmaceutical Corp.*, 481 F.Supp. 314 (E.D.N.Y.1979). This appeal followed.

Under the substantive law of New York, which is controlling herein, *Wright v. Carter Products*, 244 F.2d 53, 56–57 (2d Cir. 1957), a drug manufacturer, like any other manufacturer, can be held liable for a defective product under the theory of strict products liability. *Baker v. St. Agnes Hospital*, 70 App.Div.2d 400, 404, 421 N.Y.S.2d 81 (1979). Unlike most other products, however, ethical or prescription drugs may cause untoward side effects despite the fact that they have been carefully and properly manufactured. For purposes of strict products liability, these drugs, aptly described as "[u]navoidably unsafe products", are not deemed defective or unreasonably dangerous so long as they are accompanied by proper directions for use and adequate warnings as to potential side effects. *Wolfgruber v. Upjohn Co.*, 72 App.Div.2d 59, 61, 423 N.Y.S.2d 95 (1979) (citing Restatement (Second) of Torts § 402A, Comment k (1965)). A plaintiff who seeks recovery for an injurious side effect from a properly manufactured prescription drug must prove

that the drug caused her injury and that the manufacturer breached a duty to warn of the possibility that the injurious reaction might occur.

Although the issue of causation was hotly disputed, the causal connection between plaintiff's use of Ortho-Novum and her stroke was for the jury. Assuming that all the evidence on this issue was properly admitted, it was sufficient to support the verdict.[1] The issue of adequate warning presents a different picture.

■■■ The manufacturer's duty is to warn of all potential dangers which it knew, or in the exercise of reasonable care should have known, to exist. *Baker v. St. Agnes Hospital, supra,* 70 App.Div.2d at 405, 421 N.Y.S.2d 81; *Tinnerholm v. Parke Davis & Co.,* 285 F.Supp. 432, 451 (S.D.N.Y. 1968), *aff'd on other grounds,* 411 F.2d 48 (2d Cir. 1969). The duty is a continuous one, requiring the manufacturer to keep abreast of the current state of knowledge of its products as gained through research, adverse reaction reports, scientific literature, and other available methods. *Baker v. St. Agnes Hospital, supra,* 70 App.Div.2d at 406, 421 N.Y.S.2d 81. Except where FDA regulations otherwise provide, the manufacturer's duty is to warn the doctor, not the patient. The doctor acts as an "informed intermediary" between the manufacturer and the patient, evaluating the patient's needs, assessing the risks and benefits of available drugs, prescribing one, and supervising its use. *Wolfgruber v. Upjohn Co., supra,* 72 App.Div.2d at 61, 423 N.Y.S.2d 95.

Plaintiff was seen by five doctors prior to her stroke, two prescribing physicians and three treating physicians. Any of them could have instructed her to stop using Ortho-Novum. However, the jury heard testimony from the prescribing doctors only. We are persuaded from our review of the record that, before and during the trial, neither party was concerned about what warning, if any, should have been given the treating physicians. The theory that liability could be premised on the inadequacy of warnings to those doctors does not appear to have crystallized until the time of the court's charge.

The district judge commenced his charge on this issue by instructing the jury that the defendant was under a duty to give timely and adequate warnings to the medical profession of dangerous side effects which, in the exercise of reasonable care, it knew or should have known to exist. He then charged that this duty applied to both the prescribing physicians and to those who might reasonably be expected to be treating physicians. He stated that the defendant was required to give each doctor such information as he might reasonably be foreseen to need in order to prescribe for, warn, and treat his patient. In determining this need, the jury was instructed to take into account "what education the doctors to whom these notices come may reasonably be expected to have had, how specialized the area of knowledge is concerning which they are being advised, and the consequences or risks of a failure adequately to warn the doctors."

It is somewhat misleading to say that defendant owed a duty to warn the "medical profession". We are not concerned here with whether adequate warnings were given to chiropodists in California or orthopedists in Arizona. Mrs. Lindsay contends that Ortho's drug was defective as to her because Ortho did not adequately warn her doctors. So far as these plaintiffs are concerned, if Ortho adequately warned Mrs. Lindsay's doctors, the drugs were not defective. *See Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1276 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Sterling Drug, Inc. v. Cornish,* 370 F.2d 82, 85 (8th Cir. 1966). Evidence of the warnings given the medical profession generally was probative on this issue. Whether different or lesser warnings would suffice as to plaintiff's doctors, had to be determined, however, on the basis of the knowledge and training of those doctors and their

---

1. Ortho asserts that prejudicial evidence on the issue of causal relation was improperly admitted by the trial court. This contention will be addressed later in this opinion.

preexisting familiarity with the nature of the drug.

We find no merit in Ortho's contention that it had a duty to warn only the prescribing physicians. *See Hoffman v. Sterling Drug Co.*, 485 F.2d 132, 141–42 (3d Cir. 1973). We find substantial merit, however, in Ortho's contention that plaintiffs did not show an actionable failure on Ortho's part to give adequate warning to the three treating physicians. Such warnings can be conveyed by means other than the drug package inserts, around which so much of the controversy at trial centered. They can be given by "detailmen", specially trained field representatives of the manufacturers, by informative insertions in the Physician's Desk Reference, by product cards distributed to doctors and available at medical conventions and hospital exhibits, and by "Dear Doctor" letters sent to physicians.

The substance of the warning required depends upon the physician involved. A warning need be given only "where the situation calls for it." *Basko v. Sterling Drug, Inc.*, 416 F.2d 417, 426 (2d Cir. 1969) (citing Restatement (Second) of Torts § 402A, Comment k). "[N]o one needs notice of that which he already knows." *Billiar v. Minnesota Mining and Manufacturing Co.*, 623 F.2d 240, 243 (2d Cir. 1980) (citing *Borowicz v. Chicago Mastic Co.*, 367 F.2d 751, 758 (7th Cir. 1966)). *See also Wolfgruber v. Upjohn Co., supra*, 72 App.Div.2d at 62, 423 N.Y.S.2d 95; *McDaniel v. Williams*, 23 App.Div.2d 729, 257 N.Y.S.2d 689 (1965); *Parker v. State*, 201 Misc. 416, 422, 105 N.Y.S.2d 735 (Ct.Cl.1951), *aff'd*, 280 App. Div. 157, 112 N.Y.S.2d 695 (1952).

If plaintiffs claim that Ortho is liable for a failure to give adequate warning to any or all of Mrs. Lindsay's physicians, they must prove that Ortho failed to give those physicians a reasonable warning under all the circumstances. *Rainbow v. Albert Elia Building Co.*, 49 App.Div.2d 250, 253, 373 N.Y.S.2d 928 (1975). In this respect, plaintiff's burden is the same as it would be in an ordinary negligence action. *Wolfgruber v. Upjohn Co., supra*, 72 App.Div.2d at 62, 423 N.Y.S.2d 95; *Rainbow v. Albert Elia Building Co., supra*, 49 App.Div.2d at 253, 373 N.Y.S.2d 928; *New York Pattern Jury Instructions—Civil* PJI 2:141 at 103 (2d ed. Supp.1979). The failure to give adequate warnings is the "defect" in the product upon which the plaintiffs base their claim. *Id.* The full burden of proving that such a defect existed and that this was a proximate cause of Mrs. Lindsay's injury remained at all times on the plaintiffs. With regard to the treating physicians, the burden was not satisfied.[2]

In an effort to avert the reversal now forthcoming, the district judge, following the jury's general verdict, submitted to it the following special interrogatories:

(1) Did the warnings which caused plaintiff's injury include warnings transmitted or which should have been transmitted to the prescribing physicians Harris or Van Son, or either of them?

(2) Did the warnings which caused plaintiff's injury include warnings transmitted or which should have been transmitted to the treating physicians, Weingarten, Ryan or Vastola, or any of them?

The language of these interrogatories leaves something to be desired. It is difficult to conceptualize how plaintiff's injury could have been caused by warnings which "should have been" transmitted to her doctors. Assuming, however, that the district judge was referring to lack of warnings, the jury's affirmative answer to the first interrogatory did not cure the district judge's error in submitting the issues covered by the second. A juror who erroneously is permitted to find that adequate warnings were not given treating physicians with whom prescribing physicians consulted, could hardly be expected to erase that erro-

---

**2.** We find no merit in plaintiffs' argument that Ortho, like the defendant in *Ezagui v. Dow Chemical Corp.*, 598 F.2d 727, 732–33 (2d Cir. 1979), is collaterally estopped from denying the inadequacy of its warnings. Plaintiffs point to no case in which the medical issues were identical to those in the instant case, and identity of issues is essential for collateral estoppel. *Vincent v. Thompson*, 50 App.Div.2d 211, 216–19, 377 N.Y.S.2d 118 (1975).

neous finding from his mind when determining whether the prescribing physicians were adequately warned. Indeed, the juror quite properly might view the adequacy of warnings to prescribing physicians in the light of all the surrounding circumstances, including the warnings, if any, given specialists who were consulted.

Ortho urges, moreover, that the affirmative answer to the first interrogatory cannot stand, because the warnings given to the prescribing physicians were adequate as a matter of law. In support of this argument, Ortho relies upon cases such as *Wolfgruber v. Upjohn Co., supra*, 72 App.Div.2d at 62–63, 423 N.Y.S.2d 95, *Goodson v. Searle Laboratories*, 471 F.Supp. 546, 547–48 (D.Conn.1978), *Dunkin v. Syntex Laboratories, Inc.*, 443 F.Supp. 121 (W.D.Tenn.1977), and *Chambers v. G. D. Searle & Co.*, 441 F.Supp. 377, 382–85 (D.Md.1975), *aff'd per curiam*, 567 F.2d 269 (4th Cir. 1977). In opposition, plaintiffs rely on cases such as *Basko v. Sterling Drug, Inc., supra*, 416 F.2d at 426, and *McEwen v. Ortho Pharmaceutical Corp.*, 270 Or. 375, 528 P.2d 522 (1974). Because of the somewhat unusual manner in which the treating physicians were brought into the liability picture, and because there must be a new trial in any event, we think that in justice to both parties, it is better for this Court not to pass upon this issue at the present time. *See Werner v. Upjohn Co.*, 628 F.2d 848 (4th Cir. 1980); *Stonehocker v. General Motors Corp.*, 587 F.2d 151, 158–59 (4th Cir. 1978). As discussed in the paragraphs that follow, we find taint in some of the evidence offered on the issues framed by the first interrogatory. It would be fairer to both sides if the legal adequacy of plaintiffs' proof on these issues was determined on the basis of properly admitted evidence only.

At all times relevant to this action, Ortho-Novum packages contained inserts, which included instructions for prescribing physicians on the proper use of the drug and warnings as to possible side effects. Since 1968, the substance of these inserts has been dictated to a large extent by the FDA through its promulgation of uniform labeling requirements. By regulations effective in the first instance on July 11, 1970, the FDA required contraceptive manufacturers to distribute with their products an additional package insert intended for the information of the actual users of the drug. *See* 35 Fed.Reg. 9001–03 (1970).[3]

Although plaintiff received her last prescription for Ortho-Novum on February 24, 1970, the district judge nonetheless permitted evidence as to the contents of subsequent inserts and revisions to be considered by the jury. Included were revisions made as late as 1978. *See* 21 C.F.R. § 310.501 (1980). The warnings contained in the patients' pamphlets, couched as they were in lay terms, were much stronger and more dogmatic than those given to the doctors. For example, the 1970 insert stated that "[t]he most serious known side effect is abnormal blood clotting which can be fatal" and the 1978 warning stated that "[a] clot can result in a stroke (if the clot is in the brain) a heart attack (if the clot is in a blood vessel of the heart) . . . ." Plaintiff's counsel made telling, and sometimes improper, use of some of these subsequent warnings, and the district court compounded the prejudice resulting therefrom by instructing the jury that it might consider the 1970 labeling changes in determining whether Ortho's warnings to plaintiff's doctors were adequate.[4]

Because an ischemic cerebral vascular accident involves an occlusion, a partial or complete closing off of the vessels that supply blood to the brain, the lay warnings, such as those above quoted, went to the heart of the medical issues in this case. The judge charged the jury that it might find reflected in several of the changed labels what the FDA concluded were the

3. The FDA has recently decided that beginning in 1981 the pharmaceutical industry must provide informational leaflets to patients for ten additional prescription drugs including, among others, Darvon.

4. This is somewhat like using a medical article in Readers Digest as a model for a textbook on cardiovascular diseases.

risks of harm posed by the use of the drugs. At another point, the court indicated that subsequent insertions could be considered as admissions by Ortho.

In view of the control over label terminology exercisable by the FDA, *see* 21 U.S.C. § 355(e), we question whether a change in language should be construed as a voluntary admission by the manufacturer. *See Vockie v. General Motors Corp.,* 66 F.R.D. 57, 60–62 (E.D.Pa.), *aff'd,* 523 F.2d 1052 (3d Cir. 1975); *International Paper Co. v. Delaware and H. R. Corp.,* 73 F.Supp. 30, 35 (N.D.N.Y.1938). *But see Farner v. Paccar, Inc.,* 562 F.2d 518, 526–27 (8th Cir. 1977).[5] Ortho contends that the labeling changes are more aptly described as subsequent remedial measures, evidence of which is proscribed by Rule 407 of the Federal Rules of Evidence. *See Smyth v. Upjohn Co.,* 529 F.2d 803 (2d Cir. 1975); *Werner v. Upjohn Co.,* 628 F.2d 848 (4th Cir. 1980).

Moreover, insofar as the labeling changes may be said to "reflect" FDA conclusions, they do not fall readily within the public record hearsay exception of Rule 803(8) of the Federal Rules of Evidence, since they deal with medical opinions, not facts. *See Smith v. Ithaca Corp.,* 612 F.2d 215, 220–23 (5th Cir. 1980); *Franklin v. Skelly Oil Co.,* 141 F.2d 568, 571–72 (10th Cir. 1944).

When testimony of this sort is offered, the court must consider under Rule 403 whether its probative value is outweighed by the danger of unfair prejudice and confusion. *Apicella v. McNeil Laboratories, Inc.,* 66 F.R.D. 78, 86 (E.D.N.Y.1975). The extensive use that plaintiffs' counsel made of the post-accident warnings illustrates well this danger. We need not decide whether the admission of these warnings constituted such an abuse of discretion as to warrant retrial in a case otherwise unimpeachably tried. We conclude here that their admission, coupled with the comments of court and counsel, were sufficiently damaging to the defendant that the case should be retried in its entirety, including the medical issue of causal relation.

The district court also erred in its charge to the jury on the issue of whether Mrs. Lindsay was contributorily negligent in purchasing and using Ortho-Novum without a prescription between March 1968 and February 1970. The court instructed the jury that it must consider whether Mrs. Lindsay knew or should have known about the dangers inherent in the drug with regard to injuries such as those she suffered, and in view of those dangers should have known about the importance of securing a prescription. Where, as here, federal law prohibits the dispensing of a drug without a prescription, *see* 21 U.S.C. § 353, the propriety of securing and ingesting that drug without a prescription does not depend upon the user's knowledge of the particular dangers involved. *See Wolfgruber v. Upjohn Co., supra,* 72 App.Div.2d at 61, 423 N.Y.S.2d 95. On the present record, which incidentally does not include any testimony from the druggest who supplied the Ortho-Novum, we cannot say, however, that Mrs. Lindsay was guilty of contributory negligence as a matter of law.

The final argument of appellant which merits comment concerns the district judge's charge on the statute of limitations. Plaintiffs commenced this action in October 1972 to recover damages for the stroke which Mrs. Lindsay suffered in January 1971. The court charged that if the jury was not convinced that Mrs. Lindsay's stroke resulted from an injury to her system prior to the statutory period, but on the contrary was caused or contributed to by the ingestion of pills within the period, her claim was not barred. Ortho objects to the term "contributed to" and the district judge's erroneous calendar computation of the statutory limitation period. We address only the first alleged error because the second will not recur.

---

**5.** The patient's warning starts off with the statement "THIS LABEL IS REQUIRED BY THE FOOD AND DRUG ADMINISTRATION."

Under the New York law of strict products liability, an injury occurs and the statute of limitations begins to run when the ingestion of a defective drug takes place. *Thornton v. Roosevelt Hospital*, 47 N.Y.2d 780, 781, 417 N.Y.S.2d 920, 391 N.E.2d 1002 (1979). Any damages resulting from a specific ingestion must be sued for within three years. Once plaintiffs establish the existence of causally related injuries, the burden is on Ortho to prove which of those injuries, if any, resulted from ingestions that preceded the litigation by more than three years. *Beugger v. Ashley*, 161 App.Div. 576, 581, 146 N.Y.S. 910 (1914); *Mead v. Warner Pruyn Div.*, 87 Misc.2d 782, 786, 386 N.Y.S.2d 342 (1976). If Ortho can prove that, had Mrs. Lindsay taken no Ortho-Novum within the three-year statutory period she would nonetheless have suffered the injuries for which she sues, plaintiffs cannot recover. To the extent that Ortho fails to sustain that burden of proof on retrial, plaintiffs may recover. *See Wright v. Carter Products, supra*, 244 F.2d at 63.[6]

Judgment reversed and case remanded for retrial.

---

**6.** We believe this Court should wait until the New York courts speak before applying the continuous treatment doctrine to cases involving manufacturers, as the court did in *Holdridge v. Heyer-Schulte Corp.*, 440 F.Supp. 1088, 1098–1100 (N.D.N.Y.1977). *See Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 743–46 (2d Cir. 1979).