**Rose Mary HALL, Administratrix of the Estate of Powell Oscar Hall, and Rose Mary Hall, Individually**

v.

**ASHLAND OIL CO. a/k/a Ashland Chemical Co. and XYZ Companies.**

**Civ. No. H–81–600 (MJB).**

United States District Court, D. Connecticut.

Jan. 15, 1986.

Matthew S. Shafner, Peter J. Bartinik, O'Brien, Shafner, Bartinik, Stuart & Kelly, Groton, Conn., for plaintiff.

John J. Bogdanski, Hadleigh H. Howd, H. Franklin Hostetler, III, Jill A. Hanau, Howd & Ludorf, Hartford, Conn., for defendant.

## RULING ON MOTION FOR SUMMARY JUDGMENT

BLUMENFELD, Senior District Judge.

This product liability claim arises out of the exposure of plaintiff's decedent, Powell Oscar Hall, to benzene allegedly manufactured and sold by the defendant to the decedent's employer. The plaintiff, Rose Mary Hall, brought action as administratrix of her husband's estate and on her own behalf, seeking damages for his personal injury and death, punitive damages, and damages for loss of consortium. Her complaint is based upon theories of strict products liability, negligence, and breach of warranty for failure to test the product, warn of its dangers, or instruct as to its safe use. The defendant, Ashland Oil, Inc., is a Kentucky corporation which sold benzene to Pfizer, the decedent's employer.

Ashland has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(b), claiming that there are no issues of material fact in dispute and that it is entitled to judgment as a matter of law. Ashland's argument, in capsule form, is that a manufacturer is not required to warn the employees of its industrial customers of dangers associated with its products where the customer is a knowledgeable user. Both parties have submitted briefs supported by affidavits and deposition testimony. Oral argument was heard on the motion on October 29, 1985.

*Summary Judgment*

Under Federal Rule of Civil Procedure 56(b) "[a] party against whom a claim ... is asserted ... may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof." Subsection (c) provides that the judgment sought shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c).

The party opposing summary judgment must set forth some specific facts showing that there is a genuine issue for trial. Fed. R.Civ.P. 56(e); *Donnelly v. Guion,* 467 F.2d 290, 293 (2d Cir.1972). The burden, however, is on the moving party to demonstrate the absence of any genuinely-disputed issues of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Hayden Publishing Co., Inc. v. Cox Broadcasting Corp.,* 730 F.2d 64, 68 (2d Cir.1984). The facts are to be viewed in the light most favorable to the non-moving party, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); and any ambiguities or inferences to be drawn from the facts must be resolved in favor of the non-moving party. *United States v. One Tinteretto Painting Entitled "The Holy Family with Saint Catherine and Honored Donor",* 691 F.2d 603, 606 (2d Cir.1982).

On a motion for summary judgment, the court's role is to determine whether issues remain to be tried, and not to try issues of fact. *Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317, 1320 (2d Cir.1975); *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.,* 388 F.2d 272, 279 (2d Cir.1967), *cert. denied,* 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972). Summary judgment is a convenient device for disposing of a case efficiently when there are not significant issues of fact to be tried. *American Mfrs. Mut. Ins. Co.,* 388 F.2d at 278. At the same time, it is a drastic measure that deprives the opposing party of the chance to present its case to a jury. *Heyman,* 524 F.2d at 1320; *Donnelly v. Guion,* 467 F.2d at 291. For this reason, a motion for summary judgment should be considered with prudence and should not be granted unless the moving party clearly meets its burden of showing the absence of any genuine issue of

fact. *See Adickes v. S.H. Kress & Co.,* 398 U.S. at 153, 90 S.Ct. at 1606.

Applying these well-established principles to this motion, the court must interpret the facts presented in the affidavits and pleadings of the parties in the light most favorable to the plaintiff. Ashland has the burden of demonstrating that no genuine issues of material fact remain to be tried and that, as a matter of law, there is no possibility that the plaintiff could prevail. Because plaintiff has raised substantial unresolved issues of material fact, as discussed below, Ashland has not met its burden and the motion for summary judgment will be denied.

*Facts*

Many elements of the scenario underlying this claim appear to be undisputed. From 1970 until 1980 the decedent was employed by Pfizer, Inc., a chemical and pharmaceuticals manufacturer. During most of that period Hall worked as a chemical operator in the Ascorbic section of Building 123 at Pfizer's Groton plant. Pfizer used benzene as a solvent in the manufacture of bulk pharmaceutical products. Although benzene was not used in the Ascorbic department where Hall worked, it was used in the Organics II department which was located in the same building.

Ashland Oil is a manufacturer and distributor of petrochemicals, including benzene, a substance found in the natural environment. From 1972 to 1977 Pfizer purchased benzene from Ashland. Ashland delivered the benzene in bulk liquid form to Pfizer in 4,000 gallon tank trailers. At the Groton plant, the benzene was piped from the trucks into storage tanks located at the side of Building 123.

Hall died of leukemia on October 1, 1980. His widow claims that his leukemia was caused by exposure at the Pfizer plant to benzene supplied by Ashland.

*Discussion*

Ashland's motion for summary judgment focuses on the question of whether it breached a duty to warn of the risks associ-

ated with its product. Ashland argues that there is no claim that the benzene, a natural substance, was improperly manufactured or contaminated, and that the only thing that could render it defective would be a breach of a duty to warn. This approach to the problem is supported by comment k to § 402A of the Restatement (Second) of Torts, which discusses "unavoidably unsafe products":

> There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use.... Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. [Emphasis in original.]

*See also Basko v. Sterling Drug, Inc.*, 416 F.2d 417 (2d Cir.1969) (applying Connecticut law).

From this point, Ashland goes on to claim that in the circumstances of this case it satisfied any duty to warn and is therefore entitled to judgment as a matter of law. Ashland's theory is based upon the "learned intermediary" and "knowledgeable user" exceptions to the duty to warn. The manufacturer argues that where "a bulk product is sold to a skilled industrial user which is familiar with the risks attendant thereto and which totally controls its use, the manufacturer's duty to warn is limited, as a matter of law, to the learned or informed intermediary, and not to an employee thereof." Memorandum of Law in Support of Motion for Summary Judgment at 10. In addition, the argument continues, the skilled industrial user is held to the standard of an expert concerning the products it uses in its manufacturing processes, and therefore is a knowledgeable user to whom no warning is necessary. The bottom line is that Ashland claims that it could satisfy its duty to warn in this case without actually furnishing any warning, and therefore that it could not have breached any such duty.

Ashland's contention involves the application of several legal arguments. Dissect-

ed into its component parts, it asks the court to hold as a matter of law that: (1) the only ground for holding Ashland liable is a failure to warn; (2) when a product is sold in bulk to an industrial user for use by its employees the supplier's duty to warn extends only to the employer as a learned intermediary and not to the users; (3) a manufacturer such as Pfizer can be held to the knowledge of an expert as to all of the risks associated with each of the components involved in its manufacturing processes; and (4) a supplier's duty to warn an industrial purchaser of risks to its employees is excused where the purchaser is held by law to know of the risks independently. If any one of these legal arguments is rejected, Ashland's theory falls apart. In this case, the applicability of each of these legal assumptions is open to serious doubt. The most troublesome are the learned intermediary and knowledgeable user doctrines, especially when combined in this way.

### a. *Learned intermediary*

The learned intermediary theory developed in the area of prescription drugs, where courts have held that a manufacturer can fulfill its duty to warn by supplying an adequate warning to the medical profession concerning risks attendant upon use of a drug. *Basko v. Sterling Drug, Inc.*, 416 F.2d 417 (2d Cir.1969) (applying Connecticut law); *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir.1968) (Montana law); *Goodson v. Searle Laboratories*, 471 F.Supp. 546 (D.Conn.1978) (Connecticut law). These decisions reflect the unique circumstances that surround the dispensing of prescription drugs and which make a warning to the medical profession an appropriate and reliable means of fulfilling the duty to warn the ultimate users.

The selection of medication for a patient "is essentially a medical [decision] involving an assessment of the medical risks in the light of [the] patient's needs and susceptibilities." *Davis*, 399 F.2d at 130. In a practical sense, a doctor is a necessary intermediary because only a physician has

the training and knowledge to make an initial determination as to the appropriateness of a given drug to a patient's condition. The doctor is also a necessary intermediary in a legal sense in such cases, because consumers cannot obtain prescription drugs without a doctor's order. *See Kirsch v. Picker International,* 753 F.2d 670, 671 (8th Cir.1985) (recognizing significance of fact that x-ray equipment, like drugs, is available only to qualified professionals). In addition, a physician has a fiduciary relationship with a patient. Ideally, the doctor truly "acts as an 'informed intermediary' between the manufacturer and the patient, evaluating the patient's needs, assessing the risks and benefits of the available drugs, prescribing one, and supervising its use." *Lindsay v. Ortho Pharmaceutical Corp.*, 637 F.2d 87, 91 (2d Cir.1980). Finally, on a practical level, courts have recognized that it is difficult for a manufacturer to reach the ultimate consumer of prescription drugs directly with a warning, and that therefore a warning to the medical profession is the "only effective means by which a warning could help the patient." *Davis,* at 130; *Basko,* at 426.

The validity of applying the learned intermediary doctrine in the area of employer/employee relationships is far from self-evident. It is true that some of the same considerations are present, the most important being the difficulty of warning the direct users of a chemical that is supplied in bulk to an industrial purchaser for its use in manufacturing processes. The purchaser/employer may well be in a better position to warn the user/employee than is the manufacturer.

It is important to recognize, however, that the medical context contains significant safeguards to the ultimate user that are not present in the industrial workplace. In its brief, Ashland equates the relationship between Pfizer and its employees with the doctor/patient relationship, claiming that Pfizer acts as an informed intermediary between its benzene suppliers and its chemical workers by using its own technical expertise to evaluate its manufacturing needs, assessing the risks and benefits of available chemical solvents, selecting one and supervising its use. Memorandum of Law in Support of Motion for Summary Judgment at 22.

Despite this carefully-constructed parallel, important distinctions leap to mind. First, unlike the doctor, whose primary purpose in selecting a drug is to promote the well-being of the ultimate user, the industrial purchaser's basic interest in selecting a chemical solvent is the overall utility of that solvent in its manufacturing processes. While avoiding health risks to its employees is a consideration that goes into choosing one chemical over another, it is not the employer's sole concern, or even its primary focus. Second, there is no guarantee that the ordinary industrial employer is an expert on health risks. A chemical company may be in a position to act as an expert concerning the industrial uses and disadvantages of a chemical and yet not have the capacity to serve adequately as a learned intermediary concerning medical risks associated with the chemical. Third, the marketing system for industrial chemicals differs from that of prescription drugs—benzene and other chemicals are not subject to the strict limitations on availability that apply to drugs. Although benzene was sold to a large industrial purchaser in this case, it can also be sold to ordinary consumers. Even in a case involving a prescription drug, the learned intermediary concept has been disregarded where the safeguards of the usual distribution process do not exist. *Davis,* 399 F.2d at 130–31 (in case of polio vaccine which was denominated a prescription drug but was not dispensed as such, warning by manufacturer to its immediate purchaser did not suffice). Fourth, the relationship of doctor and patient is a one-on-one relationship where the doctor assesses the individual needs of each patient. The facts of this case illustrate the difference in the industrial workplace, where a chemical that is used may affect large numbers of people, including those who do not work with it directly. Even an employer who is

aware of direct effects of the chemical may be unaware of more subtle or diffuse risks. Finally, the prescription drug cases, in relieving manufacturers of the duty to warn drug users, shift that duty on to a party who can be held legally liable to the patient for failing to fulfill it. This powerful incentive is absent in the case of an employer whose liability is limited by the exclusive remedy provisions of the workman's compensation statutes.

Even if the learned intermediary theory were to be applied to cases involving sales of bulk chemicals in the industrial workplace, that theory alone would not relieve Ashland of a duty to warn. The prescription drug cases merely shift the direction that such a warning must take, by requiring the manufacturer to provide an adequate warning to the intermediary. *Basko,* 416 F.2d at 426; *Davis,* 399 F.2d at 130; *Kirsch,* 753 F.2d at 672 (dissent) (manufacturer of x-ray machine had no duty to warn patient, but was required to warn the doctor adequately).

■ The evidence provided by plaintiff in opposition to this motion suffices to establish a genuine issue of fact as to whether Ashland provided adequate warnings to Pfizer. Plaintiff has submitted deposition testimony of Pfizer employees that the first information that Pfizer received from Ashland concerning the dangers of benzene was a Material Safety Data Sheet ("MSDS") that Ashland sent to Pfizer on January 12, 1977. Ashland has not presented evidence that it transmitted warnings earlier. Although it has submitted a copy of a MSDS dated 1975, it is not clear when such a MSDS was sent to Pfizer. Since the decedent was employed at Pfizer from 1970 to 1980, and Ashland supplied benzene to Pfizer from 1972 to 1977, plaintiff's evidence suggests that it could be found that throughout most of the period of decedent's alleged exposure, Ashland did not warn Pfizer concerning benzene. In view of this testimony, the court could not hold as a matter of law that Ashland adequately warned Pfizer. The adequacy of a warning is a question of fact

for the jury. *See Billiar v. Minnesota Mining and Manufacturing Co.,* 623 F.2d 240, 246 (2d Cir.1980) (applying New York law).

#### b. *Knowledgeable user*

■ To get past the issue of the adequacy of warnings to the intermediary, Ashland interjects the knowledgeable user exception to the duty to warn as an extension of the basic informed intermediary theory. In tort law, one with a duty to warn is not liable for failing to warn a party of facts that the party already knew. *Lindsay,* 637 F.2d at 92; *Billiar,* 623 F.2d at 243. The theory of this exception is that a failure to warn a party of a danger of which it was independently aware cannot be the proximate cause of injury resulting from that danger, since presumably the party would not have acted differently even if warned. *Kirsch,* 753 F.2d at 671 (failure to warn doctor was not proximate cause of plaintiff's injury if doctor was already aware of the cancer risks associated with radiation therapy).

Again, the applicability of this exception to a case such as the present one is questionable. As plaintiff points out, knowledge of a risk is not necessarily the same thing as knowledge of the extent of the risk. *Cf. Billiar,* at 247 (criticizing "dubious" notion that a party will act the same way regardless of whether the risk of which it is aware is large of small). This distinction militates strongly against the defendant's argument that an industrial employer should be held to the knowledge of an expert concerning all of the components of its manufacturing processes and that that imputed knowledge should be enough to cut off the duty of the manufacturer of the components to warn of risks associated with their use, particularly when it is the ultimate users who must bear those risks.

Other courts have refused to accept the theory that the fact that bulk sales of natural materials are made to industrial purchasers who might be termed "knowledgeable users" should insulate the manu-

facturers of the materials from any duty to warn. *See Whitehead v. Saint Joe Lead Co., Inc.,* 729 F.2d 238 (3d Cir.1984) (no summary judgment for lead manufacturer on theory that it sold lead to employer who was knowledgeable user and that dangers of lead were well known; applying New Jersey law); *Oman v. Johns-Manville,* 764 F.2d 224 (4th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 351, 88 L.Ed.2d 319 (1985) (no error in refusal to instruct jury that the fact that the plaintiff's employer was a sophisticated user cut off the manufacturer's duty to warn).[1]

Even if this legal theory were applied, however, coupled with the learned intermediary theory, serious factual issues remain to be resolved. Plaintiff contests vigorously the defendant's claim that Pfizer is an expert with respect to benzene and the health risks attendant to its industrial use. Unless Ashland can establish as a matter of fact that Pfizer knew of these risks or had sufficient expertise to be charged by law with knowledge of them, Ashland has no theory that would justify a failure to warn either Pfizer or its employees. The factual basis to support its legal theory has not been made out at this point.

#### c. *Issues of material fact*

■ As discussed above, the legal theory that Ashland proposes in support of its claim to judgment as a matter of law contains several serious weaknesses.[2] Accepting that theory in its entirety for the moment, however, *solely* for purposes of this motion for summary judgment, it is clear that Ashland's motion must be denied. Even if the court were to follow Ashland's theoretical lead every step of the way, significant unresolved factual issues remain.

Although the evidence is not crystal clear (as deposition testimony rarely is), plaintiff has provided enough evidence to support its contention that the question of Pfizer's knowledge of the health dangers of benzene or its status as a "knowledgeable user" are matters open to dispute. Plaintiff cites deposition testimony of several Pfizer employees, including Ralph Gifford who, during the decedent's employment, was Operations Manager for Groton Quality Control Operations, Department Manager for the Organics II and Ascorbic Departments, and Director of Regulatory Affairs for the chemical division of Pfizer; Robert Dray, an engineering and safety aide who did benzene testing in 1976 and 1977; and others. This deposition testimony supports the claim that for at least some of the relevant period Pfizer did not have knowledge of the health risks of benzene and that a manufacturer's warning would have caused the company to act differently.

---

1. The defendant relies heavily on *Goodbar v. Whitehead Brothers,* 591 F.Supp. 552 (W.D.Va. 1984), *aff'd sub nom. Beale v. Hardy,* 769 F.2d 213 (4th Cir.1985). The authority of *Goodbar,* even in its own jurisdiction, is unclear. Only two months earlier, the Fourth Circuit Court of Appeals had held en banc in *Oman* that a district court did not err in refusing to instruct a jury that an asbestos manufacturer's duty to warn the ultimate users, employees of its purchaser, was satisfied if the employer/purchaser was aware of the dangers involved in use of the product. 764 F.2d at 233. *Oman* and *Goodbar* rely upon the same Virginia cases and section 388 of the Restatement (Second) of Torts, yet they reach opposite conclusions and neither case cites the other.

Another extremely significant consideration is that in *Goodbar,* the federal court was interpreting the law of Virginia, a state which has never adopted the doctrine of strict product liability. *Goodbar,* 591 F.Supp. at 555. The case before the court today is governed by Connecticut tort law, which explicitly recognizes strict product liability and has adopted section 402A of the Restatement (Second) of Torts. *See, e.g., Garthwait v. Burgio,* 153 Conn. 284, 289, 216 A.2d 189 (1965); *Rossignol v. Danbury School of Aeronautics, Inc.,* 154 Conn. 549, 559, 227 A.2d 418 (1967). The fundamental difference in the approach that these two states take toward the liability of product manufacturers limits the relevance of *Goodbar* to this case.

2. Neither party has cited Connecticut law on these issues (with a few minor exceptions). The role of a federal court sitting in a diversity action is to apply the law of the forum state, not to blaze new legal trails for that state. This court cannot simply fashion a doctrine to cover the situation at hand by reference to opinions of other federal courts around the country, but must give careful consideration to the product liability law of the State of Connecticut and attempt to determine the law that the state courts would apply in this situation.

There is testimony that although Pfizer had a technical review committee composed of experts within the company "to provide interpretation of technical publications with regard to toxicity of materials," (Gifford Deposition at 86), it did not come into being until 1976 (Gifford Deposition at 85). Depositions indicate that prior to a study by the National Institute for Occupational Safety and Health in 1976, and the decision of the Occupational Safety and Health Administration to lower the threshold limit value for benzene in that same year, Pfizer's only source for acceptable benzene levels was a set of guidelines in a publication of the American Conference of Governmental Industrial Hygienists (ACGIH). (Gifford Deposition at 89–90). As plaintiff points out, these ACGIH guidelines are not in evidence and their sufficiency as a basis for holding Pfizer to have had knowledge of the risks cannot be assessed on this motion.

There is evidence that if Pfizer had known of the risks it would have acted differently. Pfizer employees testified that many suppliers sent the company information concerning their products and that such information was taken seriously. (Gifford Deposition at 49). There is evidence that at the point at which Pfizer's awareness of the risks was allegedly activated by the NIOSH study, it did in fact take action. For instance, there is testimony that in 1976 Pfizer's Chemicals in the Workplace Program became more formalized (Gifford Deposition at 87); the technical review committee was started (Gifford Deposition at 85), and the company began eliminating benzene from its processes (Gifford Deposition at 59).

There is also some evidence, discussed above, that Ashland did not provide a timely or adequate warning to Pfizer. Plaintiff points to testimony that the first information Pfizer received from Ashland concerning dangers of benzene was the MSDS sent in 1977.

The defendant has submitted evidence suggesting that the level of sophistication at Pfizer concerning benzene was substantially higher than the plaintiff claims. This evidence takes the form of testimony from the Gifford and Tapley depositions and an affidavit of Alan Rossi, Administrative Manager of the Industrial Chemicals and Solvents Division of Ashland. It has also submitted opinions of the United States Supreme Court and the Fifth Circuit Court of Appeals in cases involving the government's attempts to regulate benzene levels as evidence that the health risks of benzene have long been a matter of public record. The defendant's evidence is certainly not conclusive, however; it merely establishes that there are genuine issues of fact as to these issues.

On a motion for summary judgment, the court must view the facts in the light most favorable to the non-movant. Accordingly, after resolving all ambiguities and drawing all inferences in favor of the plaintiff, it is evident that this is not a case where the pleadings and evidence clearly show that plaintiff cannot establish any set of facts upon which it can recover. Rather, even on the legal theory that the defendant puts forward, the plaintiff has demonstrated that there are material issues of fact that remain in genuine dispute.

This is not to say that the defendant's legal theory is completely without merit or that the plaintiff will not face substantial hurdles in proving its case before a jury. Neither of these propositions is sufficiently clear at this point and on this record, however, to justify foreclosing the presentation of the evidence to a jury for a finding of fact.

*Conclusion*

As discussed in the foregoing, plaintiff has adequately specified facts establishing that there remain genuine issues of material fact in dispute in this case and that defendant is not entitled to judgment as a matter of law at this point. For that reason, the motion of Ashland Oil for Summary Judgment is hereby denied.

SO ORDERED.

## ADDENDUM

The many factual uncertainties involved in this case, as discussed in the foregoing, and the apparent absence of independent progress towards settlement between the parties suggest that resolution of the case might be facilitated by some form of court-assisted settlement attempt, such as the summary jury trial procedure which is currently being used to good effect. Such a procedure would serve to give each party a realistic perspective on the strengths and weaknesses of its case and on the risks and benefits of proceeding to trial. The parties are invited to respond to the suggestion of a summary jury trial in writing within ten days of the date of this ruling. The case, now scheduled for trial on January 22, 1986, will be assigned a new trial date thereafter.