724 F.Supp. 1 (1989)
Cruz PEDRAZA, et al., Plaintiffs,
v.
SHELL OIL COMPANY, Defendant.
Civ. A. No. 85-0421-F.
United States District Court, D. Massachusetts.
November 13, 1989.
Frank R. Saia, Edward V. Leja, Springfield, Mass., for plaintiffs.
Burt Ballanfant, Shell Oil Co., Houston, Tex., Robert Leonard, Barry Ryan, Springfield, Mass., for Shell Oil Co.

MEMORANDUM AND ORDER
FREEDMAN, Chief Judge.

I. INTRODUCTION
Before the Court is defendant Shell Oil Company's ("Shell") objections to Magistrate Michael Ponsor's March 15, 1989 Report and Recommendation that Shell's motion for summary judgment be denied. The plaintiff[1] Cruz Pedraza ("Pedraza") disagrees with Shell's objections, and urges this Court to adopt the Magistrate's recommendation. Shell has filed a response to the plaintiff's memorandum.

*2 II. BACKGROUND
This is a diversity action, in which Pedraza is claiming that "his lungs were permanently damaged as a result of inhaling the chemical epichlorohydrin (`ECH') while employed by defendant United Technologies Corporation, Power Systems Division (`U.T. C.')." Magistrate's Report and Recommendation Regarding Defendant Shell Oil Company's Motion for Summary Judgment ("Magistrate's Report") at 1. The plaintiff originally filed suit on November 4, 1985 against his employer and two chemical manufacturers, Shell and Dow Chemical ("Dow"), alleging assorted theories of negligence, including negligent design, manufacture, and distribution, as well as strict liability and breach of implied warranties. Magistrate's Report at 2. On March 2, 1987, this Court accepted the Magistrate's recommendation that U.T.C. be dismissed from the case and, on October 5, 1987, that Dow be dismissed as well, leaving Shell the only defendant in this suit. Magistrate's Report at 2-3.
Shell's current motion for summary judgment is in fact its second attempt to extricate itself from this lawsuit. The company's original motion for summary judgment was dismissed without prejudice by this Court on March 2, 1987. The parties then engaged in extensive further discovery. Alleging new evidence and new Massachusetts case law, Shell moved again for summary judgment on June 24, 1988. As grounds for its motion, Shell made two separate arguments: 1) that the statute of limitations bars the plaintiff's action, and 2) that Pratt and Whitney, the owner of U.T.C., should be considered a "sophisticated user" of ECH, thereby relieving Shell of any liability.
Based in part on the facts as he found them in his February 13, 1987 Report and Recommendation that Shell's initial motion be denied, and in part on the additional facts uncovered during discovery, the Magistrate again recommends to this Court that Shell's motion for summary judgment be denied. For the reasons set forth below, the Court hereby adopts the Magistrate's recommendation.

III. DISCUSSION

A. Applicable Legal Standards

1. Review of Magistrate Ponsor's Report and Recommendation
This matter was referred to the Magistrate for a report and recommendation pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B).[2] That section further provides that "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).
In construing the terms of section 636(b)(1), the Supreme Court has held that a district court need not hold a de novo hearing in order to satisfy the requirement of a "de novo determination." United States v. Raddatz, 447 U.S. 667, 674, 100 S.Ct. 2406, 2411, 65 L.Ed.2d 424 (1980); see also Gioiosa v. United States, 684 F.2d 176, 178-79 (1st Cir.1982) (a district court need not hold a brand new hearing to satisfy the de novo standard of review). To require a brand new hearing, the Supreme Court said, "would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts. Raddatz, 447 U.S. at 676 n. 3, 100 S.Ct. at 2412 n. 3.
Instead, it is sufficient that the district court review the transcript or tape of the Magistrate's hearing in sufficient detail to make its own determination with regard to each disputed factual finding. See generally Gioiosa, 684 F.2d at 178 and cases cited; see also LoConte v. Dugger, 847 F.2d 745, 750 (11th Cir.), cert. denied, ___ U.S. ___, 109 S.Ct. 397, 102 L.Ed.2d 386 *3 (1988) ("To the extent that the magistrate has made findings of fact based upon the testimony of the witnesses heard before the magistrate, the district court is obligated to review the transcript or listen to the tape-recording of those proceedings").
Shell does not challenge the Magistrate's findings of fact per se. Instead, Shell questions the conclusion that the Magistrate reached based on those facts, in light of the relevant legal standards discussed below. The First Circuit has held that the requirement of a "de novo determination" only applies to the Magistrate's factual findings; "issues of a `technical, legal' nature presented to a magistrate are `certainly ... amenable to disposition [by the district court] by appellate type briefing and argument.'" Gioiosa, 684 F.2d at 179, quoting United States v. Southern Tanks, Inc., 619 F.2d 54, 56 (10th Cir.1980). In light of the fact that the Magistrate's purely factual findings are largely unassailed, this Court's obligation to review the tape of the hearing is substantially reduced. Where necessary, however, the Court has independently examined the documentary evidence in the record upon which Shell relies.

2. Summary Judgment Standard
Pursuant to the provisions of Fed.R. Civ.P. 56(c), this Court has an obligation to grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact...."
In order to avoid the imposition of summary judgment, Pedraza must persuade this Court that there is a dispute about "facts that might affect the outcome of the suit under the governing law...." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In addition, Pedraza must also show that the dispute about the facts is genuine, that is, that "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252, 106 S.Ct. at 2512.
In weighing the evidence before it to determine if it is more than a "scintilla," id., or "mere allegations," Fed.R.Civ.P. 56(e), this Court has a duty to "`look at the record in ... the light most favorable to ... the party opposing ... the motion' ... [and] indulge all inferences favorable to the party opposing the motion." Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir.1975), quoting Poller v. Columbia Broadcasting System, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). "If, after this canvassing of the material presented, the district court finds that some genuine factual issue remains in the case, whose resolution one way or another could affect its outcome, the court must deny the motion." Lipsett v. University of Puerto Rico, 864 F.2d 881, 895 (1st Cir.1988) (emphasis in the original).
The standard for granting summary judgment is even stricter in instances where, as is the case here, the material fact in question involves a party's state of mind. "State of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind." Hahn, 523 F.2d at 468.

B. The Defendant's Preemption Argument Has Been Waived
As a preliminary matter, the Court addresses Shell's contention that Occupational Safety and Health Administration ("OSHA") standards for the inhalation exposure to ECH preempt Connecticut standards, and that accordingly, Pedraza's common law claims against Shell for failure to warn are barred. See Shell's Notice of Appeal From and Objection to the Report and Recommendation of the Magistrate at 10-13, and Defendant Shell Oil Company's Response to Plaintiff's Reply Memorandum at 1-6. The plaintiff argues that Shell has waived any preemption argument, since it did not raise it before the Magistrate. Plaintiff's Reply Memorandum to Defendant, Shell Oil Company's Objection to Report and Recommendation of Magistrate Ponsor Re: Shell's Motion for Summary Judgment at 1.
*4 As the First Circuit has said, "[p]arties must take before the magistrate, `not only their "best shot" but all of their shots.'" Borden v. Secretary of Health and Human Services, 836 F.2d 4, 6 (1st Cir.1987), quoting Singh v. Superintending School Committee of the City of Portland, 593 F.Supp. 1315, 1318 (D.Me.1984) ("[f]ailure to make an argument ... constitutes its waiver for purposes of further appellate review of the Magistrate's action").[3]
The Court has carefully reviewed both of Shell's motions for summary judgment, and concludes that the plaintiff is correct. The Court finds that the defendant did not raise the issue of preemption before the Magistrate, and accordingly, has waived the defense. To the extent that Shell has raised the issue of the impact of various OSHA standards on this litigation, it has done so in the context of whether or not Pratt and Whitney had or should have had express or implied knowledge of the potential effects of ECH, and not in terms of the preemptive effect such standards might have on the plaintiff's common law claims.

C. The Statute of Limitations Does Not Bar This Action

1. Statute of Limitations in Product Liability Cases
The crux of Shell's summary judgment motion is that Pedraza's claim is barred by the Massachusetts statute of limitations, which is made applicable to this dispute by the principles of diversity jurisdiction. See Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, rehearing denied, 326 U.S. 806, 66 S.Ct. 7, 90 L.Ed. 491 (1945); Buckley v. American Honda Motor Company, Inc., 780 F.2d 1 (1st Cir. 1985); Hemric v. Reed & Prince Mfg. Co., 739 F.2d 1, 2 (1st Cir.1984) (regardless of the choice of substantive law, the court must apply the procedural statute of limitations of the forum state).
For both Pedraza's negligence and breach of warranty claims, the statute of limitations is three years. See Mass.Gen. Laws Ann. ch. 260, § 2A[4] and Mass.Gen. Laws Ann. ch. 106, § 2-318,[5] respectively. The more difficult question, and the salient issue in this case, is exactly when the statute of limitations began to run with respect to the plaintiff's claim. Since the statutes themselves do not state the point at which they begin to run, the fixing of the inception of the statute of limitations in a given case is a determination for the Court to make. Olsen v. Bell Telephone Laboratories, Inc., 388 Mass. 171, 445 N.E.2d 609, 611 (Mass.1983).
The job of determining when the statute of limitations begins to run is hampered in the case of an "insidious disease" like the one suffered by Pedraza, since the cause of action against the defendant could be said to occur on a number of different dates.[6] *5 To resolve the difficulty, the Massachusetts courts have adopted the "discovery rule," under which a cause of action for the negligent infliction of an insidious disease does not accrue (and the statute of limitations does not begin to run) until the plaintiff "knew or should reasonably have known that he had contracted [the disease] as a result of the conduct of the defendants." Id. 445 N.E.2d at 612.
In order to find that the "discovery rule" is applicable to the plaintiff, this Court must be satisfied that the plaintiff (1) had knowledge of his injury, and (2) that he had knowledge of its causespecifically, that he had knowledge he was harmed as a result of the defendant's conduct. Fidler v. Eastman Kodak Company, 714 F.2d 192, 198 (1st Cir.1983). However, as the Massachusetts Appeals Court has noted, "notice of likely cause is ordinarily enough to start the statute running." Lear-Heflich v. Schwartz, 21 Mass.App.Ct. 928, 930, 485 N.E.2d 692 (1985), review denied, 396 Mass. 1106, 488 N.E.2d 1179 (1986) (Table) (quoting Fidler, supra at 199).
Since this suit was filed on November 4, 1985, the question before this Court is whether or not a reasonable jury could find that the plaintiff did not know or have reason to know prior to November 4, 1982 that Shell's conduct was the likely cause of his injury.

2. Relevant Facts
A reasonable jury could find the following facts:
In 1969, prior to his employment at U.T.C., Pedraza underwent chest surgery. Following the surgery itself, Pedraza also received radiation therapy. Magistrate's Report at 5.
The plaintiff began working for U.T.C. sometime in 1972. He suffered no symptoms of asthma until approximately June 1977, roughly one month after he was assigned to a new chemical mixing operation at work. Id. Shortly thereafter, however, the plaintiff began experiencing "symptoms of fatigue, shortness of breath, dizziness, loss of consciousness, tearing eyes, burning eyelids and the spitting up of blood." Id. at 6. It seems clear from the evidence on the record that Pedraza was aware of the onset of the symptoms, and noticed that they were exacerbated on those days when he was assigned to the chemical mixing operation. Id.
A number of serious asthma attacks culminated in the plaintiff's transfer to another work environment in November 1977. Id. at 7. A workman's compensation claim filed by Pedraza's employer states that the plaintiff felt that working with chemicals and gases was causing his asthma. Id.
Following a physical examination of the plaintiff in January 1978, Dr. Arthur C. DeGraff, Jr., reached the conclusion that Pedraza's condition was "`consistent with hypersensitivity reaction to Epichlorohydrin.'" Id. at 8. DeGraff's statement was made in a letter to John M. Young at Liberty Mutual Insurance Co.; however, there is no indication in the record that DeGraff informed Pedraza of his suspicions at that time. Pedraza himself stated in an affidavit that "I [Pedraza] was not aware until May of 1983 when Dr. DeGraff sent a letter to my Attorney, Frank R. Saia,J.D., [sic] that sorted out the causes of my various complaints." Affidavit of Cruz Pedraza in Opposition to Defendants' Motion for Summary Judgment on the Issue of Statute of Limitations, attached as Exhibit 1 to Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment.
The plaintiff's medical condition was further complicated in 1980 by the development of "mediastinal lymphadenitis and pericarditis." Magistrate's Report at 9. Pedraza was released from his employment by U.T.C. on July 6, 1981. Id.
Following his discharge, Pedraza filed a complaint against U.T.C. with the Connecticut Commission on Human Rights and Opportunities ("Commission"). Id. In his *6 complaint, Pedraza alleges that his asthma developed as a result of working with fiberglass materials at U.T.C., and noted that he suffered an asthma attack after being assigned to a chemical mixing station in the plant. Id. The gist of his complaint against U.T.C. was that the company failed to accommodate him and his disability. Id. However, none of the materials submitted by the plaintiff mention ECH or any product specifically produced by Shell.
The Commission's Report, which Pedraza received by certified mail in May 1982, stated that "[t]here is no medical proof to substantiate [Pedraza's] allegation that his asthma was work connected or responsible for the continued poor attendance." Magistrate's Report at 10.
The plaintiff was hospitalized twice in 1982 due to his asthma, once in June and once in October. Magistrate's Report at 11. None of the material in the record indicates that the plaintiff was informed on either occasion of the role that ECH played in his impaired lung function.
As noted above, Dr. DeGraff wrote to Attorney Saia, plaintiff's counsel, in the spring of 1983, and outlined his understanding of the various causes of the plaintiff's condition. In a letter the following November, Dr. DeGraff again reviewed the plaintiff's condition, and stated that the plaintiff had suffered a thirty percent loss of lung function over and above the lung damage caused by his mediastinal fibrosis. Magistrate's Report at 11-12.

3. Application of the Discovery Rule to the Case at Bar
In its motion for summary judgment, Shell argues that the First Circuit's decision in Cornell v. E.I. DuPont de Nemours & Co., Inc., 841 F.2d 23 (1st Cir.1988), imposes a duty on the plaintiff to "seek out the cause of his illness from the appropriate professionals." Shell Oil Company's Motion for Summary Judgment at 8. In Shell's view, Pedraza, who experienced the onset of his symptoms as early as 1977, totally failed to meet that burden.
However, Cornell is of no help to Shell, as that decision turned on particular facts not present in the current case. Cornell, a spray painter, used Imron, a Dupont paint containing Desmodur N-75, from 1980 to 1982. Id. at 23. Cornell was aware, based on his own experience and from reading the labels of the products he used, that the polyurethanes could cause damage to the lungs. Id. at 23-24. While noting that Cornell had smoked heavily for a number of years, the First Circuit also concluded that Cornell experienced specific symptoms which could only result from exposure to Imron, among them the spitting up of paint. The First Circuit found that it was undisputed that Cornell associated his physical condition with his use of the Imron paint by the end of 1980; however, he did not initiate his lawsuit until the spring of 1984. Id. Accordingly, the First Circuit affirmed the granting of summary judgment against Cornell. Id.
In the present case, there is no evidence Pedraza knew or should have known from his own experience that inhalation of epoxy resin (or ECH in particular) could cause lung damage. Although it is not clear on the record, it is at least inferable that Pedraza was working with a larger number of chemicals than was Cornell, and thus could less reasonably have been expected to know which product was causing the harm. Finally, it is certainly true that Pedraza himself experienced a wider range of systemic disorders which could conceivably have been the cause of his asthma. Under the circumstances, a jury could find that this plaintiff acted reasonably with respect to discovering the source of his injury.
Of greater similarity to the case at bar is Errichiello v. Eli Lilly and Co., 618 F.Supp. 484 (D.Mass.1985). Errichiello was diagnosed as having vaginal cancer in 1973. Id. at 485. Her doctors and various family members made a connection between Errichiello's cancer and her mother's ingestion of diethylstilbestrol ("DES") during pregnancy, but Errichiello testified that she was not told of the possible link until July 1980. Id. at 485-86. She brought suit against Lilly and five other manufactures of DES on July 22, 1982. Lilly argues that under the "discovery rule," Errichiello had a duty *7 to exercise reasonable diligence to discover the cause of her cancer in 1973, when she was first diagnosed. Id. at 486. However, the district court ruled that the "discovery rule" does not compel such diligence until such time as a plaintiff has notice not only of an injury but of its likely cause as well. Id. Given the favorable light in which the non-moving party's testimony should be regarded, the district court concluded that a question of material fact did exist as to whether or not Errichiello was informed of the possible connection between her cancer and DES prior to July 22, 1979. Id. at 486-87.
The facts in Vigeant v. Zimmer, Inc., 612 F.Supp. 1043 (D.Mass.1985) also provide strong support for the plaintiff. Vigeant had her left knee replaced with a Zimmer prosthetic device in 1977. Id. at 1044. She was hospitalized again for severe knee pain in December 1978. At that time, her doctor told her that "the pin had loosened," and surgery was performed. The doctor's notes from that operation indicate that the prosthetic device had broken. Id. Although the doctor stated that he informed Vigeant of that fact, she claimed that she did not learn that the prosthesis was defective until she was hospitalized for subsequent operation in February 1980. Id. at 1044-45. Vigeant filed suit against Zimmer on November 15, 1982. The district court concluded that Zimmer had failed to show that there was no question of material fact as to when Vigeant should reasonably have been expected to have learned that their product was defective. Id. at 1445.
Finally, the case at bar may be favorably contrasted with Shea v. Keuffel & Esser of New Jersey, Inc., 668 F.Supp. 41 (D.Mass. 1986), affirmed without opinion, 823 F.2d 543 (1st Cir.1987). Shea, an architect, developed a severe skin disorder in 1974. Id. at 42. During the next seven years, Shea underwent numerous tests in an effort to determine what was causing his malady. Id. at 42-43. The first breakthrough did not occur until April 1981, when Shea reacted positively to a test involving a brand of sepia paper used at his workplace. Id. at 43. The treating physician, Dr. Ernesto Gonzalez, informed Shea at the time of the test's results. Id.
Dr. Gonzalez then contacted the defendant, the manufacturer of the paper, and requested a list of the chemicals used in making the paper. On October 23, 1981, Shea reacted positively to diazonium, one the component parts of the sepia paper. Id. Dr. Gonzalez testified that he was certain of the connection between diazonium and Shea's condition, and further, that he discussed the results of the tests with Shea at the time. Id. The district court concluded that Shea was on notice as early as April 1981, and definitely by October 1981, that the sepia paper produced by the defendant was the likely cause of his skin condition.[7] Since Shea did not file suit until January 4, 1985, the court concluded that the suit was barred by the statute of limitations. Id. at 49.
In light of the above authorities, and mindful of the inferences which this Court is obligated to make on behalf of the plaintiff, the Court concludes that the defendant *8 has not succeeded in demonstrating that there is no issue of material fact with respect to the plaintiff's knowledge of the likely cause of his injury prior to November 1982. Accordingly, summary judgment is not appropriate.

D. Sophisticated User Defense

1. Additional Relevant Facts
In support of its argument that Pratt & Whitney was a "sophisticated user" of ECH and therefore responsible for the plaintiff's injuries, Shell relies heavily on the deposition testimony of Richard Owen, who during the relevant period of time was a board certified industrial hygienist for Pratt & Whitney. As did the Magistrate, this Court accepts as true the allegations of fact contained in Owen's testimony for the purpose of discussing Shell's claim.
Of particular relevance to Shell's sophisticated user defense is Owen's testimony that Pratt & Whitney "`recognized [its] duty as an employer to provide a workplace free from recognized hazards under OSHA.'" Magistrate's Report at 13, citing Defendant's Reply to Plaintiff's Opposition to Motion for Summary Judgment at 13. Owen also stated that Pratt & Whitney had access to a variety of documents detailing the toxicity of the products it used, including: "ACGIH criterion documents, an extensive library on toxicology, and the Shell MSDS (Material Safety Data Sheets) Sheets for Epoxy Resin." Magistrate's Report at 13-14. There is evidence on the record that Shell's MSDS sheets were available at the plant where Pedraza worked.
However, plaintiff's expert toxicologist, Thomas F. Schrager, testified at deposition that Shell had failed to give proper warnings regarding its product to Pratt & Whitney. Magistrate's Report at 14. Specifically, Schrager alleged that Shell failed to provide specific instructions that enclosed hood ventilation be used in work areas, and that the workers wear respirators while working with the epoxy resin.

2. The Sophisticated User Defense
In Shell's view, its duty to provide such warnings with respect to ECH were discharged because Pratt and Whitney should be considered a "sophisticated user" of ECH. Specifically, Shell argues that Pratt and Whitney (1) had knowledge of certain federal statutes and regulations pertaining to respiratory protection; (2) had adequate warning of ECH's hazards as evidenced by Pratt and Whitney's implementation of safety measures; (3) should be charged with the knowledge of relevant safety standards (which Shell asserts operate as a discharge of Shell's duty to warn); and (4) should be charged with knowledge of the hazards of ECH.
As the Magistrate correctly points out, the substantive law which governs the plaintiff's claims is the law of the state of Connecticut, where the alleged tort occurred. To date, the Connecticut state courts have not considered or adopted the sophisticated user defense in the toxic tort context. Indeed, it would be contradictory for them to do so in light of Connecticut's recognition of strict liability and explicit adoption of section 402A of the Restatement (Second) of Torts. See Hall v. Ashland Oil Co., 625 F.Supp. 1515, 1521 n. 1 (D.Conn.1986), citing Garthwait v. Burgio, 153 Conn. 284, 216 A.2d 189 (1965) and Rossignol v. Danbury School of Aeronautics, Inc., 154 Conn. 549, 227 A.2d 418 (1967).
Shell suggests to this Court that an "interpretation of federal statutes and regulations are at the heart of the legal issues in this case," Shell's Memorandum at 17, and that therefore, this Court should not be concerned about the possibility of blazing new trails in Connecticut tort law. That is simply not correct. A common law tort is at the heart of the legal issues in this case, a tort to which the State of Connecticut has expressed its willingness to apply the doctrine of strict liability. Whether or not various federal statutes make Pratt and Whitney a "sophisticated user," thereby shielding Shell from tort liability, is very *9 much a state law question.[8] As the Connecticut courts have not as yet addressed this question, it is incumbent upon this Court to refrain from imposing its own view upon them.
There being no indication that the Connecticut state courts would recognize the "sophisticated user" defense, this Court concludes that it is not available to Shell in this case, and accordingly declines to examine the issue further.

IV. CONCLUSION
For the reasons set forth above, the defendant Shell's objections are hereby OVERRULED, and the Magistrate's Report and Recommendation is ADOPTED. Accordingly, defendant's motion for summary judgment is DENIED.
It is So Ordered.
NOTES
[1] Also plaintiffs in this case are Cruz Pedraza's wife, Alejandrina, and his two children, Roberto and Mary Ellen. The Court's discussion focuses on Mr. Pedraza alone, as the other plaintiffs' claims rise and fall on the strength of his cause of action.
[2] 28 U.S.C. § 636(b)(1)(B) provides in relevant part as follows:

(b)(1) Notwithstanding any provision of law to the contrary
(B) a judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A)....
[3] Shell attempts to evade waiver of this argument by stating that the First Circuit decision in Wood v. General Motors Corp., 865 F.2d 395 (1st Cir.1988), represents "significant modern analysis" of the effect of the preemption doctrine on common law tort claims. Regardless of how recently the First Circuit has visited the issue, however, Shell is still not excused from its failure to raise the issue in some coherent form before the Magistrate.
[4] Mass.Gen.Laws Ann. ch. 260, § 2A (1988 supp.) provides as follows:

Except as otherwise provided, actions of tort, actions of contract to recover for personal injuries, and actions of replevin, shall be commenced only within three years next after the cause of action accrues.
[5] Mass.Gen.Laws Ann. ch. 106, § 2-318 (1988 supp.) provides in relevant part as follows:

Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer, seller, lessor or supplier of goods to recover damages for breach of warranty.... All actions under this section shall be commenced with three years next after the date the injury and damage occurs.
[6] In Olsen, the Massachusetts Supreme Judicial Court ("SJC") suggested the following possibilities:

the date of the defendant's negligent act; the date of the plaintiff's first exposure to the product; the date of the plaintiff's last exposure to the product; the date of the first physiological effect on the plaintiff, whether recognized by the plaintiff or not; the date of discovery of injury; and the date on which the plaintiff discovered, or reasonably should have discovered, that he has been harmed as a result of the defendant's conduct.
Olsen, 445 N.E.2d at 611. In the same opinion, the SJC rejected plaintiff's suggestion that a cause of action does not accrue until such time as the injured party discovers that the injury is permanent. Id. 445 N.E.2d at 612.
[7] As its first objection to the Magistrate's Report, Shell claims that throughout his report and recommendation, the Magistrate fails to distinguish between "epoxy resin," a product made by Shell, and "ECH," one of the resin's component parts. Shell argues that the statute of limitations should begin to run at the time Pedraza first linked his injury to his exposure to Shell's epoxy resin, and not at the time when Pedraza finally learned which component (i.e., ECH) was actually responsible for his injury. To a limited extent, the language of Shea supports that argument, although the district court was not called upon to make a ruling as to which date controlled the start of the statute of limitations period.

In the instant case, however, there is at least one compelling reason for holding that the later date is controlling. In light of the number of chemicals to which he was exposed, there is a serious question of fact as to whether or not Pedraza had reason to know that Shell's epoxy resin was the likely cause of his injury until such time as he learned which specific chemical agent was responsible. The numerous citations listed by the defendant merely reflect Pedraza's sense that Shell's epoxy resin was among the potential causes; they do not convince this Court that he knew or should have known that the resin was the likely source.
[8] By contrast, whether or not various federal statutes and regulations preempt state common law claims is a question of federal law. However, as was discussed supra, that question is not properly before the Court.